FILED  *Feelaid*

1  AARON LODGE, CSB #220670
   Law Offices of DeMartini & Lodge

*2008 MAY 13 P 12: 01*

2  1414 Soquel Avenue, Suite 212    **E-FILING**

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

3  Santa Cruz, California 95062

4  (831) 600-3030, FAX: (831) 603-4300
   alodge@teachjustice.com

5

6  Attorney for plaintiff, JEANNE LOVELESS **ADR**

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11  JEANNE LOVELESS, Plaintiff

12      v.                    **C08  02444  HRL**

13  US AIR/AMERICA WEST AIRLINES,  Defendant

14

15      )
16      )
17      )
18      )
19      )
20      )
21      )
22      )
    Case Number:

23

24  **COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

25  **DEMAND FOR JURY TRIAL**

26  Plaintiff, JEANNE LOVELESS, alleges as follows:

27

28              **JURISDICTION AND VENUE**

This action arises under the Air Carrier Access Act and Illinois and Pennsylvania state tort law. This Court has jurisdiction of the federal claims under 28 U.S.C. Section 1331, 1332, 1343(3) 1343(4), 2201, and 2202.

Venue is proper in the Northern District of California, San Jose Division, pursuant to 28 U.S.C. § 1391, as all defendants are subject to personal jurisdiction in this district.

## PARTIES

Plaintiff JEANNE LOVELESS (hereinafter referred to as "plaintiff") is, and at all relevant times herein was, a resident of the County of San Francisco, State of California.

DOES ONE through TWENTY (collectively referred to as the "flight attendants" or "airline personnel" or "DOES") were employees of defendants; in performing the acts alleged herein, the DOES were acting as agents of defendants.

The names and capacities of defendants DOES 1 through 20 are unknown to the plaintiff. Each of these fictitiously named parties has acted as agent of, or in concert with, the named defendants in the matters referred to herein, and is responsible in some manner for the damages suffered by plaintiff. Plaintiff will amend this complaint to add the names and capacities of such defendants when ascertained.

## FACTS *PRIOR* TO THE INCIDENT GIVING RISE TO THIS ACTION

In 1984, Ms. Loveless began to experience debilitating anxiety and claustrophobia. The symptoms were so severe that she sought both medical and

therapeutic treatment.

1    Some of Ms. Loveless' symptoms included being terrified of elevators, backseats
2
3    of automobiles, enclosed spaces, and most significantly, airplanes. As a specific
4    example, when Ms. Loveless would ride a public bus, she would be extremely
5    anxious if she could not sit near an exit, and she would need to immediately
6
7    disembark if the bus became too full. She could not enter into small office spaces,
8    enclosed rooms, or crowded areas without experiencing extreme panic and anxiety.
9        As her symptoms progressed in severity, Ms. Loveless' life became extremely
10
11   inhibited. She was unable to carry out many routine activities, such as going to the
12   grocery store, without experiencing panic attacks. She began to choose to not leave
13
14   the house, due to the fear of having a panic attack in public.
15       After numerous visits with doctors and psychiatrists, she was formally diagnosed
16   with "Post Traumatic Stress Disorder", "Anxiety" and "Severe Panic Disorder". A
17
18   diagnosis of Agoraphobia was also considered, since the Panic Disorder was so
19   severe that it was infringing on her ability to leave the house and perform the routine
20   activities of daily life. She began taking medication for the disorder and found that
21
22   the medication provided her with significant relief from her symptoms, allowing her
23   to resume many of the activities of normal daily life.
24       After nine years of regularly taking the prescribed medication, her physician
25
26   informed Ms. Loveless that long-term use of the medication had serious negative side
27   effects and that the medication was intended for short-term treatment only. She was
28

also informed that, as with many drugs, discontinuing use after extended use was dangerous if done without medical supervision and could result in seizures and other serious consequences.

In 1995, in order to safely discontinue use of the medication as well as find a new, long-term solution for her symptoms, Ms. Loveless was admitted to a specialized treatment program, located in San Diego, California. While the program medically monitored her withdrawal from medication, they also worked with her to create a new strategy to manage the Panic Disorder and anxiety. Following the new program, Ms. Loveless' condition considerably improved. However, she remained terrified of flying and airplanes, and continued to have symptoms of social anxiety and depression.

One of the most important tools prescribed to Ms. Loveless for the alleviation of her symptoms was the use of a support dog. Research shows that assistance animals can provide a sense of comfort to a person suffering from Post-Traumatic Stress Disorder, Anxiety and/or Severe Panic Disorder, and this was the case with Ms. Loveless. She obtained a small mini poodle named Zeke, whom she kept with her whenever she left the house. Zeke provided Ms. Loveless with significant and consistent relief from the debilitating anxiety that had plagued her for so many years. With him, she was able, once again, to resume many of the activities of daily life without fear of a panic attack.

Footer

In May 2006, Ms. Loveless needed to fly out of state to visit her sister who was dying of cancer. Ms. Loveless did not believe she could fly, due to her diagnoses, as her fear of airplanes had not diminished over the years. She thought she could fly if she were allowed to have Zeke with her, as he had provided her with relief from her symptoms and she had not experienced a panic attack since he had been prescribed to her. It was important to her to visit her sister before her sister's death, and although nervous, she decided to try to fly.

Ms. Loveless inquired as to whether she had a right to fly with Zeke as a support animal. She was told that she did have that right; provided she produced documentation that Zeke was a support animal.

## FACTS REGARDING SPECIFIC INCIDENTS GIVING RISE TO THIS ACTION

In May 2006, a family medical emergency occurred, necessitating that Ms. Loveless fly out of state. Due to her extreme fear of flying and airplanes, and fear of experiencing a panic attack on the flight, she took several steps to assure that she would be able to fly with Zeke, her support animal. Ms. Loveless' fear of flying was so severe that she felt she could not fly without Zeke.

Prior to securing her reservation with America West/US Air, Ms. Loveless explained her concerns to the airlines and asked for clarification regarding the airlines' requirements for letting her fly with Zeke. She had the necessary paperwork, official tags for the dog confirming his status as an assistance animal, which were

Footer

issued in San Francisco, California. She was assured that this was sufficient paperwork to allow her to fly with Zeke.

Upon making the reservation to fly with America West/US Air, Ms. Loveless again inquired about whether she would be able to fly with Zeke. She was concerned about having the proper paperwork because she was flying on short notice due to the family emergency and because she believed she could not fly without Zeke's assistance.

During the reservation process, Ms. Loveless was again assured that she could fly with an assistance animal and that she need only bring the registration tags with her as documentation. She was also assured that the situation was documented and her file was annotated in all necessary ways, documenting that she had prior approval to fly with an assistance animal. She did not purchase tickets over the phone, but instead opted to go directly to the airport to purchase the tickets. She felt this would provide her with an additional and final verification that she could fly with Zeke.

On May 14, 2006, while checking in at the ticket counter for her America West/US AIR flight, the ticket agent discussed with a supervisor the rights and regulations relating to Ms. Loveless' assistance animal. The agent stated that the computer indicated that Ms. Loveless had discussed the matter during the reservation process. The agents also assured her that would have no trouble flying with Zeke, on her lap, and need only demonstrate proper tags for Zeke, which she did. They further confirmed they were satisfied Zeke was an assistance animal and that no other

Footer

documentation would be necessary. She then purchased the ticket.

The supervisor was informed that Ms. Loveless suffered from Severe Panic Disorder and that this diagnosis was the reason Ms. Loveless needed to fly with an assistance animal. The supervisor was also informed that it was important for the boarding process to be stress-free. The supervisor assured Ms. Loveless that he would be at the gate while she boarded the plane to assure that the process would be stress-free for Ms. Loveless. The supervisor did oversee the process from the gate, and the boarding process was comfortable for Ms. Loveless.

However, once Ms. Loveless was seated on the plane with Zeke in her lap, a flight attendant directed her to place Zeke in her carry-on bag beneath the seat in front of her. Zeke, a miniature poodle, was small enough to fit beneath the seat. The flight attendant told Ms. Loveless that Zeke was just like any other property, and without special permission could not travel in her lap. Ms. Loveless attempted to explain that she had already obtained such permission, and showed the flight attendant the required tags. The flight attendant ignored the tags, demanding additional documentation authorizing Ms. Loveless to travel with Zeke. Ms. Loveless again attempted to explain that she had made all necessary arrangements in advance, and had been assisted by the supervisor who was just outside the plane at the gate. The flight attendant then loudly demanded additional written documentation from a "mental health professional".

Ms. Loveless felt embarrassed by the flight attendant's loud remarks, and was

1
2    aware that the other passengers were staring at her. She asked to speak with the
3
4    attendant privately in the back of the plane. Once at the back of the plane, Ms.
5    Loveless asked the attendant to please contact the supervisor, explaining that the
6
7    supervisor was not only aware of the circumstances but had assisted her in boarding
8    the plane. The flight attendant refused to contact her supervisor, instead continuing to
9    loudly demand additional documentation. The flight attendant was extremely loud,
10
11   demeaning and demanding toward Ms. Loveless, and completely insensitive to Ms.
12   Loveless' escalating anxiety.
13
14        Due to the stress of the situation and her escalating anxiety, Ms. Loveless began
15   to fear that she would suffer a panic attack. Although she had never had a panic
16   attack in Zeke's presence, the situation was so anxiety-producing that she feared she
17
18   would suffer an attack. She also worried that there would be a humiliating scene, if
19   she had a panic attack, including increasing worries about air marshals or others being
20   called in to calm her down. She continued to politely ask the flight attendants to
21
22   confirm with their supervisor that she had already been approved to fly with Zeke.
23   She explained she would do as she was told, but just wanted them to contact the
24   supervisor. The flight attendants flatly refused to contact the supervisor. Since Ms.
25
26   Loveless was increasingly afraid of having a panic attack, she finally acquiesced, and
27   agreed to keep Zeke in his container, and under the seat for the entire duration of the
28   flight.

1    Ms. Loveless felt extremely pressured to give in to the flight attendant's demands,

2    both to alleviate the anxiety she was feeling and to avoid further humiliation. She

3    was extremely concerned that she would suffer a panic attack, so she agreed to try to

4    fly without Zeke. As they concluded their discussion at the rear of the plane, Ms.

5    Loveless said that she would file a complaint once she was back home. This

6    appeared to tremendously upset one of the flight attendants. As Ms. Loveless moved

7    toward her seat, the plane lurched forward and began pulling away from the gate.

8    Ms. Loveless lost her balance, stumbling, which sharply jarred the container in which

9    Zeke was being held. The dog made a yelping sound, while securely in his container.

10    A flight attendant began shouting that Zeke was a threat to security and demanded

11    that Ms. Loveless and Zeke be removed from the plane. This was the same flight

12    attendant who had humiliated and embarrassed Ms. Loveless, refusing to contact the

13    supervisor and the same flight attendant who appeared so upset by Ms.-Loveless'

14    statement that she would file a complaint.

15    Ms. Loveless was extremely distraught, fearful and anxiety-ridden by the

16    experience, as well as being confused. She was forcibly removed from the plane with

17    Zeke. The official reason for her removal was that Zeke was a threat to passenger

18    safety.

19    Zeke was an elderly and very small dog, who was in a carrier at the time he was

20    deemed a "security risk". He was a fully licensed support dog, with an extremely

21    non-threatening, calm demeanor. Had he been otherwise, he would not have been a

support dog for anxiety disorders. Ms. Loveless had taken Zeke with her everywhere she had gone for years, and there had never been a single incident, nor a single allegation of an incident, with him. Zeke was a special dog, carefully trained, and especially chosen for extremely calm demeanor as well as his disarming and nurturing presence. Zeke had assisted Ms. Loveless on trains, busses, subways, boats, and many other types of facilities and situations. In fact, while out of state, Ms. Loveless took her sister-in-law nearly daily to chemotherapy treatment in the critical care unit in the hospital. Zeke accompanied Ms. Loveless on all such occasions, without a problem. When asked, Ms. Loveless would simply show the tags, demonstrating Zeke was an assistance animal.

In addition to the humiliation, anxiety, and confusion that Ms. Loveless suffered by her wrongful removal from the airplane, she was then forced to find a hotel in Chicago that would accept both her and her assistance animal. She was without any of her belongings, as all of her luggage had been on the plane to San Francisco.

The next day, Ms. Loveless checked-in, boarded the plane and flew without incident. She again received clearance for Zeke at the ticket counter, and again went to the gate without incident. She was extremely fearful that there would be another incident once on the plane. Once on board she asked the flight attendant if she would need any additional documentation for Zeke. The attendant said no, "once you are cleared by the gate personnel, the flight crew has no further say in the matter." When she explained to a flight attendant what had happened the day earlier, the attendant

expressed disbelief. The attendant said, "that never should have happened," and "once an assistance animal is cleared for boarding, that is it—yesterday's flight attendant was simply wrong." It was especially shocking that the flight attendants treated her so harshly, because they were aware of her condition, and that the very reason Ms. Loveless had a support animal was to prevent her from having a panic attack and to protect her mental and physical health.

Once home, Ms. Loveless filed a complaint with the airline's executive offices. After an investigation, the airline recognized an egregious error had been made with regards to Ms. Loveless' right to fly with her support animal. The airline sent her a letter of apology, a free ticket, and reimbursement for her hotel expense. The airline explained they simply had not had time to train personnel about assistance/companion animal travel.

After these apologies on behalf of the airline, and acknowledgement that her rights were violated, Ms. Loveless decided to try to put the incident behind her. Although she was still upset, she believed such an incident would not happen again to her or to anybody else similarly situated. This belief was reinforced by the information that the airline had created a computer profile clearly documenting her approval to travel with an assistance animal. She was told if she decided to fly again, the crew would be well aware, in advance, of her special needs, and that the situation on May 14, 2006 would not occur again.

On July 13, 2006, Ms. Loveless set out to fly on America West/US Air using her free ticket. Due to the bad experience on the prior flight, she sought to do everything in her power to make sure the airline had everything they needed to allow her to safely board with Zeke.  Upon arrival at her initial boarding city in North Carolina, she was told her file had been adequately noted that she was approved to fly with an assistance animal.  She showed them the tags and boarded the plane to fly to the connecting city of Philadelphia.  That flight went smoothly and Ms. Loveless was relieved to find that it appeared that the airline had in fact, properly trained its personnel with regard to procedures relating to assistance animals

Once in Philadelphia, she checked in at the gate, showed the proper documentation for Zeke, and received a supervisor's approval to board.  In addition, prior to boarding, she asked that the flight crew on board the plane be told in advance that she was approved to fly with an assistance animal.  She was assured that a supervisor would inform the entire flight crew of Ms. Loveless' situation and approval to fly with Zeke.  She was then told: "you are in good hands, there will not be any problems boarding and flying to your final destination with your support dog."

The supervisor accompanied her to the gate and continued to reassure her the flight crew would be fully informed of Zeke's approval to fly as an assistance animal.  Once on the plane, it became clear that the manager had not pre-boarded to explain the situation.  The flight crew did not know about Ms. Loveless' condition or her approval to fly with an assistance animal.  A flight attendant said, "you can't fly with

a dog!", and Ms. Loveless began to fear that the humiliating situation that occurred on May 14, 2006, was happening again.

Ms. Loveless provided the flight attendant with two forms of documentation. The first was a letter from a certified health professional, documenting her condition. The second was the documentation of Zeke's status as an assistance animal. She asked the attendant to look at the documentation. Ms. Loveless also asked the attendant to check with the supervisor outside at the gate, explaining that he was aware of her situation and had already approved her to fly with Zeke. The flight attendant refused to even look at the documentation and stated, "it doesn't matter what you have, you can't fly with a dog." Just as before, the attendant began to speak loudly, and Ms. Loveless became aware that many other passengers were then looking at her. Ms. Loveless began to experience increasing fear and anxiety, as well as disbelief that the situation was occurring again. She became extremely frightened and anxious, concerned that she would have a panic attack.

Because of her experience on the flight of May 14, 2006, Ms. Loveless did not believe it was worthwhile to try to convince the flight attendant to review her documentation after the attendant refused. The experience on May 14, 2006, had been so traumatic for her that she could not bear the though of it happening again. She was experiencing increasing anxiety and panic, and was extremely fearful that she would have a panic attack. In order to protect her mental and physical health, she simply left the plane. She exited into the gate area and collapsed in a chair crying.

1   Once again she was facing finding a place to stay without her luggage (already on

2   board), and once again she felt entirely humiliated and fearful. While in the gate area,

3
4   the Captain of the aircraft approached her, informing her that the flight crew now

5   realized their mistake and they would correct the error. However, at this point, Ms.

6
7   Loveless was experiencing such extreme anxiety, humiliation and stress, as well as

8   fear that many other passengers had witnessed the incident, and she was not able to

9   board the plane.

10
11  While in the gate area, a supervisor saw Ms. Loveless and inquired as to what had

12  happened. The supervisor discussed the matter with the plane crew, and learned that

13  the crew had failed to accept Zeke as an assistance animal. It became evident the
14
15  earlier gate manager had not boarded the plane, as promised, to assure the flight crew

16  were fully informed. The airline personnel then told Ms. Loveless they were

17  confused any issues arose because her file was clearly marked, everything had been in
18
19  order, and she had already flown successfully that very day in order to arrive in

20  Philadelphia. The airline arranged and paid for her to stay in a hotel. The next day

21
22  Ms. Loveless flew home without incident. The flight attendants again expressed

23  disbelief about the incidents of the previous day.

24
25  As with the first experience on May 14, 2006, the airline again sent a written

26  apology to Ms. Loveless and offered her another free flight. Ms. Loveless declined

27  the offer, stating that such an offer cannot compensate her feeling of public

28  humiliation. The airline did not provide her the minimum standard of treatment, as

required by law. The airline violated her right to travel with an assistance animal, without abuse, public humiliation, or excessive difficulty.

Therefore, once again upon returning home, Ms. Loveless filed a complaint with the airline regarding her two experiences. In addition to filing her complaint directly to the airline, she also filed it with the U.S. Department of Transportation (hereafter DOT). Based on her complaints, the DOT began an investigation of the two incidents. After several months, the DOT completed its investigation. Regarding the first flight, the DOT stated that they could not make a final ruling because the airline had stated there was a "security issue," which if true, trumps the airline's responsibility to follow the ACAA. However, the DOT supports Ms. Loveless' claim that she had a right to fly with her assistance animal. Zeke was not a security risk, and therefore the airline should have allowed Zeke to fly.

The DOT did find a violation of the ACAA had occurred on July 13, 2006. The DOT INVESTIGATION SUMMARY SHEET, states that: "US Airways will be charged with a violation for failure to properly review Ms. Loveless' documentation and based on US Airways concession that it is taking steps to prevent similar occurrences." (Attachment A).

After an investigation, the airline also wrote a letter to Ms. Loveless finding a clear violation of her rights. In the letter from US AIRWAYS, the executive liaison states "our in-flight agent was not knowledgeable," and that the agent was 'incorrect." The letter then states that for such individuals who qualify, the ACAA clearly

provides "your dog may be on your lap."

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE AIR CARRIER ACCESS ACT (ACAA)

### (FAILURE TO RECEIVE AND FURNISH TRANSPORTATION)

Plaintiff refers to and incorporates herein the allegations in all Paragraphs above.

Defendants failed in their duty to receive and transport plaintiff passenger, as required by the Air Carrier Access Act, Federal Aviation Act of 1958, § 404(c)(1), as amended, 49 U.S.C.A.App. § 1374(c)(1).

Defendants failed to transport passenger, and provided false reasons for the failure to allow Ms. Loveless to fly. Although the cited reason was "passenger safety", there was no evidence to support this allegation. Defendant allowed plaintiff to board and fly the following day, without incident, and with apology, further demonstrating not only that passenger was not a threat to passenger safety, but also that defendants were aware of these facts.

As a further direct and proximate result of these acts of these defendants as described herein, plaintiff suffered numerous damages and expenses relating to these damages, including but not limited to medical expenses due to extreme emotional distress, legal fees, counseling expenses, hotel cost and transportation costs.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF THE AIR CARRIER ACCESS ACT (ACAA)

### (PROHIBITION AGAINST DISCRIMINATION)

1     Plaintiff refers to and incorporates herein the allegations in all Paragraphs above.

2     Defendants violated the ACAA by discriminating against plaintiff, an otherwise

3

4     qualified individual by the ACAA's definition.  In pertinent part, the ACAA

5     prohibits:

6                    Air carriers from discriminating against an otherwise qualified

7

8                    individual on the following grounds:

9                             (1) the individual has a physical or mental impairment

10

11                            that substantially limits one or more major life

12                            activities.

13

14                            (2) the individual has a record of such impairment.

15                            (3)the individual is regarded as having such an

16                            impairment.  49 U.S.C. § 41705(a).

17            The Department of Transportation (DOT) found that the airline had violated

18

19     the Air Carrier Access Act, and implementing regulations 14 CFR 382.55 (a) (1).

20            Although Ms. Loveless contacted the defendants on multiple occasions and

21

22     did everything within her power to assure that she would be able to fly with her

23     assistance animal, the defendants twice violated her rights by not allowing her to fly.

24     The airline failed to properly train its staff in order to protect the civil rights of Ms.

25     Loveless, and others.  The flight attendants refused to simply contact the supervisor to

26

27     determine whether Ms. Loveless was correct that she had the necessary

28     documentation for flying with her assistance animal.

Furthermore, the situation occurred two separate times, in two separate cities, with two different flight crews, evidencing a pattern of discrimination and negligence.

As a further direct and proximate result of these acts of these defendants as described herein, plaintiff suffered numerous damages and expenses relating to these damages, including but not limited to medical expenses due to extreme emotional distress, legal fees, counseling expenses, hotel and transportation costs.

### THIRD CLAIM FOR RELIEF

**Intentional Infliction of Emotional Distress**

Plaintiff refers to and incorporates herein the allegations in all Paragraphs above.

Emotional distress damages are allowable under the ACAA. (*Tallarico v. Trans World Airlines, Inc.,*. 881 F.2d 566, 568-70 (8th Cir.1989).

Defendant has committed the tort of intentional infliction of emotional distress under both Pennsylvania and Illinois law.

There are four elements that a plaintiff must establish in order set forth a cause of action for IIED: (1) the conduct of defendant must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) defendant's conduct must cause emotional distress; (4) the distress must be severe. Restatement (Second) of Torts § 46 (1965).

The individual defendants' conduct was not only shocking and outrageous, it was intentional and malicious. Additionally, defendant's conduct was grossly negligent, exhibiting a deliberate and reckless disregard for plaintiff's rights, causing plaintiff to

suffer humiliation, mental anguish, emotional and physical distress, and plaintiff was injured in mind and body, to her damage in amounts according to proof. As such plaintiff is entitled to punitive damages against defendants, according to proof.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all of the above claims for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief as to all Claims for Relief:

- A judgment awarding plaintiff general and special damages against defendants and punitive damages against the individual defendants in amounts according to proof;

- A judgment awarding plaintiff reasonable attorney's fees;

- A judgment awarding plaintiff his costs of suit; and

- Such other and further relief as the Court deems proper.

RESPECTFULLY SUBMITTED:

Dated May 12, 2008

_A. Lodge_

AARON J. LODGE, Attorney for plaintiff, JEANNE LOVELESS



**U.S. Department
of Transportation**

Office of the Secretary
of Transportation

GENERAL COUNSEL

400 Seventh St., S.W.
Washington, D.C. 20590

**JUN 0 5 2007**

Ms. Jeanne Loveless
1360 Green Street #11
San Francisco, CA 94109

Dear Ms. Loveless:

This letter is in further reference to a disability complaint concerning your travel with US Airways on May 14 and July 13, 2006. We were sorry to hear of the incident and appreciate the opportunity to advise you of the outcome of our investigation. Enclosed you will find an Investigation Summary Sheet that details the results of our investigation, which was based on the Air Carrier Access Act (ACAA), 49 U.S.C. § 41705, and our implementing rule, 14 CFR Part 382.

In particular, the Investigation Summary Sheet identifies the applicable section of 14 CFR Part 382, provides a brief summary of that section and explains this office's view on whether the carrier has violated the ACAA and 14 CFR Part 382. If your complaint raises more than one disability issue, an additional Investigation Summary Sheet has been attached to address each issue.

If we believe the complained of incident involves a violation, the Investigation Summary Sheet indicates the action that we plan to take. We will either pursue formal enforcement action or by copy of this letter notify the airline specified in your complaint of our determination and warn it that any similar incidents could lead to formal enforcement action. Generally, we will pursue enforcement action on the basis of a number of complaints from which we may infer a pattern or practice of discrimination. However, where one or a few complaints describe particularly egregious conduct on the part of a carrier and those complaints are supported by adequate evidence, we will pursue enforcement action as our resources permit. If we decide to seek enforcement action against the airline, your complaint will be among those considered in the context of this action, which may lead to the issuance of a cease and desist order and to the assessment of civil penalties. In the event that this enforcement action leads to litigation, it is possible that we may need sworn statements or witnesses for a hearing. We will advise you if, in fact, we need your further help.

For your information, in an enforcement case, the U.S. Department of Transportation is limited to issuing cease and desist orders and assessing civil penalties not to exceed $25,000 per violation. Such action can only be accomplished through settlements or formal hearings before administrative law judges. We cannot order compensation for aggrieved parties. To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based on private contract rights or on civil rights statutes that provide for a private right of action.

If we have insufficient evidence or it appears that the airline specified in your complaint has not violated the ACAA, we will not pursue enforcement action. Notwithstanding our decision not to pursue enforcement action, however, private legal action may be pursued in the courts based on private contract rights or on civil rights statutes that provide for a private right of action and, in such a proceeding, monetary damages may be sought.

Regardless of whether the airline has been determined to have violated the ACAA, we have entered your complaint in our computerized industry monitoring system, and the carrier's ACAA complaint totals in our monthly *Air Travel Consumer Report* reflect your complaint. Our monthly report is made available to the aviation industry, the news media and the general public so that both consumers and air travel companies can compare the overall complaint records of individual airlines, as well as the number of disability complaints filed against particular carriers. This system also serves as a basis for rulemaking, legislation and research.

Moreover, we also routinely monitor our complaint records to determine the extent to which carriers are in compliance with the ACAA and to track trends or spot areas of concern which we feel may warrant further action. This ongoing process also enables us to ensure prompt corrective action whenever we determine that an airline's policies or procedures are not in compliance with our ACAA regulations. Your complaint will be among those considered in the context of this overall process.

I hope this further information is useful. Thank you again for taking the time to contact us.

Sincerely,

Blane A. Workie
Chief, Aviation Civil Rights Compliance
Branch
Office of the Assistant General Counsel for
    Aviation Enforcement and Proceedings

By:    Daeleen Chesley
       Trial Attorney

Enclosure(s)

CC:  US Airways

# United States Department of Transportation

## INVESTIGATION SUMMARY SHEET

| | | | | |
|---|---|---|---|---|
| Case Number: | HU 06-10-01 | | Airline | US Airways/America West |
| Complainant Title | Ms. | Last Name | Loveless | First | Jeanne | MI |

| Address 1 | 1360 Green Street #11 |
|---|---|
| Address 2 | |
| City | San Francisco | State | CA | Zip Code | 94109 |

| Passenger(s) | Jeanne Loveless |
|---|---|
| Travel Date(s) | 7/13/06 | Flt. No. | 563 | City Pair | San Francisco, CA - Philadelphia, PA |
| Location of Incident | Onboard flight 563   US airways |

**Complaint Issue**

Ms. Loveless stated she got off the aircraft because the flight attendant did not believe her dog, Zeke, was a service/emotional support animal and began questioning Ms. Loveless in a loud and embarrassing manner.

**Applicable Section of 14 CFR Part 382**    382.55 (a) (1)/DOT Service Animal Guidance

**Section Summary**

Carriers shall accept the following as evidence that an animal is a service animal: identification cards, other written documentation, presence of harnesses or markings on harnesses, tags, or credible verbal assurances of the qualified individual with a disability using the animal.

DOT Guidance: With respect to an animal used for emotional support (which need not have specific training for that function), airline personnel may require current documentation (i.e., not more than one year old) on letterhead from a mental health professional.

**Remarks**

Ms. Loveless stated while traveling on a free ticket, she had both written documentation and assistance animal tags for Zeke. Ms. Loveless stated that a manager went to the gate with her and was suppose to inform the flight crew that she was traveling with a service animal. When Ms. Loveless boarded the flight, she said a flight attendant refused to allow her to fly with Zeke as an assistance animal, regardless of what documentation and tags she had. Ms. Loveless said she became embarrassed in front of many passengers and became fearful she would be put off the aircraft, so she asked to leave. In an August 7, 2006, follow-up letter from a conversation, US Airways writes [Ms. Loveless] claims she felt discriminated against, singled out and totally humiliated when the agent shone a spotlight on her requesting documentation in a public manner. Ms. Loveless' October 10, 2006 email to the DOT stated that the flight attendant claims not to care if she had documentation or not, but her conversation with US Airways and follow up letter states that Ms. Loveless was upset with the manner the documents were asked for. While DOT is not commenting on the adequacy of Ms. Loveless' medical documentation, carriers are required to review what documents a passenger has, therefore US Airways will be charged with a violation for failure to properly review Ms. Loveless' documentation and based on US Airways concession that it is taking steps to prevent similar occurrences:

If we decide to seek enforcement action against this US Airways, with respect to this issue, your complaint will be among those considered, which may lead to the issuance of a cease and desist order and to the assessment of civil penalties. In this case, we will warn US Airways by copying them in on this finding.

# United States Department of Transportation

## INVESTIGATION SUMMARY SHEET

| | | | | |
|---|---|---|---|---|
| Case Number | HU 06-10-01 | Airline | US Airways/America West | |
| Complainant Title | Ms.    Last Name    Loveless | First | Jeanne | MI |
| Address 1 | 1360 Green Street #11 | | | |
| Address 2 | | | | |
| City | San Francisco | State | CA | Zip Code  94109 |

**Passenger(s)**  Jeanne Loveless

**Travel Date(s)**  5/14/06    Flt. No.  694    City Pair  Chicago, IL - Phoenix, AZ

**Location of Incident**  Onboard flight 694    US Airways

**Complaint/Issue**  Ms. Loveless stated she was removed from the aircraft because the flight attendant deemed her service/emotional support animal, Zeke, a threat to passenger safety.

**Applicable Section of 14 CFR Part 382**  382.55 (a) (1)/DOT Service Animal Guidance

**Section Summary**  Carriers shall accept as evidence that an animal is a service animal identification cards, other written documentation, presence of harnesses or markings on harnesses, tags, or credible verbal assurances of the qualified individual with a disability using the animal.

DOT Guidance:  Before deciding to exclude the animal, the carrier should consider and try available means of mitigating the problem (e.g., muzzling a dog that barks frequently, allowing the passenger a reasonable amount of time under the circumstances to correct the disruptive behavior).

**Rule Violated?**  See Remarks

**Remarks**  Ms. Loveless stated that she had to travel because of an emergency and did not have the proper documentation, with such short notice, to provide to the airline. When she arrived at the airport, she explained her situation to a supervisor. The supervisor gave Ms. Loveless approval and allowed her to board the flight. Ms. Loveless states in one letter that the flight attendant requested written documentation for Zeke to fly and in a note states that the flight attendant informed her that Zeke had to remain in his bag the entire flight. Ms. Loveless writes that she was not happy with the flight attendant informed her that Zeke remaining in the bag the entire flight and went to the back of the aircraft to discuss the matter with the flight attendant. While in the back of the aircraft, Ms. Loveless stated the aircraft began to move and she lost her balance and grabbed Zeke, causing him to yelp. In US Airways' passenger record, the flight attendant stated the "dog snapped and growled." Because of this, the flight attendant had the aircraft pull back to the gate to deplane Ms. Loveless and Zeke for safety reasons because she claimed the pet and passenger were unruly. Based on the claims made by Ms. Loveless and the US Airways passenger record, it appears that the flight attendant was going to allow Zeke to fly, but only under the seat and not based on Part 382. Ms. Loveless disagrees with the assertion that she was unruly and because there is conflicting evidence, it is difficult to determine if a violation occurred. While we cannot determine if Ms. Loveless was unruly in this case, we do note flight attendants have the right at any time under Federal Aviation Administration guidelines, to deny travel to anyone they deem to be a safety hazard to the safety of the passengers because of unruly behavior.

Due to the conflicting evidence, DOT is unable to determine that the carrier violated the ACAA. In other words, based on our review of the conflicting evidence submitted to us, we cannot state definitively if the carrier did, or did not, violate our rules in this instance. We will, however warn US Airways on DOT Guidance about giving passengers an opportunity to mitigate concerns about a dog's behavior.

§ JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Jeanne Loveless

**DEFENDANTS**

US Airways/America West Airlines

**(b)** County of Residence of First Listed Plaintiff  San Francisco
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  N/A
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

E-FILING

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Aaron Lodge
Law Offices of DeMartini & Lodge
1414 Soquel Avenue, Suite 212
Santa Cruz, CA 95062
(831) 600-3030

Attorneys (If Known)

Unknown

ADR  C08  02444  HRL

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

|   |   |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

|   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Med. Malpractice | ☐ 625 Drug Related Seizure      28 USC 157 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury— | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &      Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'      Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability      Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability / ☐ 370 Other Fraud | | | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability      Property Damage | Act | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Product Liability | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / ☐ 510 Motions to Vacate | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing      Sentence | Security Act | or Defendant) | Act |
| ☐ 240 Torts to Land | Accommodations  **Habeas Corpus:** | | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 530 General | | 26 USC 7609 | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities— / ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access |
| | Employment / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities— / ☐ 550 Civil Rights | ☐ 463 Habeas Corpus— | | ☐ 950 Constitutionality of |
| | Other / ☐ 555 Prison Condition | Alien Detainee | | State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | Transferred from | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
49 USC 41705

Brief description of cause:
Violation of plaintiff's civil right

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION    DEMAND $
UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND          ☒ SAN JOSE

DATE  5/12/08

SIGNATURE OF ATTORNEY OF RECORD